# EXHIBIT A

**EFiled:  Mar 12 2024 03:13PM EDT**
**Transaction ID 72496904**
**Case No. 2024-0221-LWW**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LOUIS SMITH, | ) |
| | ) |
| Plaintiff, | ) C.A. No. 2024- |
| | ) |
| v. | ) |
| | ) |
| AHMED M. FATTOUH, BRANDON | ) PUBLIC VERSION FILED: |
| BENTLEY, JEFFREY HARRIS, PIETOR | ) MARCH 12, 2024 |
| CINQUEGRANA, MATTHEW | ) |
| LUCKETT, ALLEN PINTO, BRIAN Q. | ) |
| PHAM, MINISH K. PATEL, | ) |
| INTERPRIVATE ACQUISITION | ) |
| MANAGEMENT LLC, and | ) |
| INTERPRIVATE LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Louis Smith ("Plaintiff"), on behalf of himself and similarly situated current and former stockholders of InterPrivate Acquisition Corp. ("InterPrivate" or the "Company"), brings this Verified Class Action Complaint asserting: (i) breach of fiduciary duty claims arising from the impairment of Plaintiff's and Class (defined herein) members' redemption rights in connection with InterPrivate's March 12, 2021 merger (the "Merger") with private company Aeva, Inc. ("Legacy Aeva") against (a) Ahmed M. Fattouh ("Fattouh"), Brandon Bentley ("Bentley"), Jeffrey Harris ("Harris"), Pietor Cinquegrana ("Cinquegrana"), and Mathew Luckett ("Luckett"), in their capacities as members of InterPrivate's board of directors (the

"Board" or the "Director Defendants"); (b) InterPrivate Chief Executive Officer ("CEO") Fattouh, InterPrivate General Counsel ("GC") Bentley, InterPrivate Senior Vice Presidents ("SVP") Allen Pinto ("Pinto") and Brian Q. Pham ("Pham"), and InterPrivate Vice President ("VP") Minish K. Patel, in their capacities as officers of InterPrivate (the "Officer Defendants") and (c) InterPrivate Acquisition Management LLC (the "Sponsor"), InterPrivate Capital LLC ("IP LLC"), and Fattouh, and Bentley, in their capacities as InterPrivate's controllers (the "Controller Defendants"); and (iii) unjust enrichment against all Defendants.

These allegations are based on Plaintiff's knowledge as himself, and on information and belief, including counsel's investigation and review of publicly available information and review of documents produced in response to books-and-records inspections made pursuant to Delaware General Corporation Law, section 220, (the "220 Demand") as to the balance of the allegations set forth herein.

## NATURE OF THE ACTION

1. InterPrivate, now renamed Aeva Technologies, Inc. ("New Aeva"), is a Delaware corporation that was formed as a special purpose acquisition company ("SPAC") by the Controller Defendants. The Controller Defendants took InterPrivate public as a shell company and subsequently merged it with private company Legacy Aeva in the Merger.

2

2.      A SPAC, also known as a "blank check company," is a publicly traded company without commercial operations that is formed strictly to raise capital through an IPO for the purpose of entering into a business combination with another company within a specified period of time. The proceeds of the SPAC's IPO are held in trust for the benefit of public stockholders. When a business combination is agreed to by the SPAC, and prior to the transaction's consummation, the SPAC's public stockholders are presented with a decision: they can elect to redeem all or a portion of their shares—and receive a proportionate share of the funds held in trust— or they can invest those funds in the post-combination company. If a SPAC does not close a business combination within the time specified in its charter, it is required to liquidate, in which circumstances public stockholders would receive a proportionate share of the IPO proceeds and any other contributions to the trust, plus interest accrued in the trust.

3.      InterPrivate's history is part of a disturbing trend of SPAC transactions in which financial conflicts of interest of sponsors and insiders override good corporate governance and the interests of SPAC public stockholders. The InterPrivate Merger with Legacy Aeva failed to observe the most basic principle of Delaware corporate governance—namely, that a corporation's governance structure should be designed to protect and promote the interests of public stockholders, not the financial interests of its insiders and controllers. Instead, Defendants granted

3

themselves financial interests in the SPAC that diverged from those of public stockholders and allowed their financial interests to override their fiduciary duties and responsibilities as controlling stockholders, directors, and/or officers of a Delaware corporation by forcing through a value destroying merger with Legacy Aeva which was accomplished through the provision of false and misleading disclosures and material omissions to stockholders impairing stockholders' right to redeem their shares in lieu of investing in a merger.

4.      Defendants had a powerful incentive to cause InterPrivate to enter into a business combination and avoid a liquidation. Prior to the IPO, the Controller Defendants caused InterPrivate to issue 5,750,000 shares of InterPrivate common stock ("Founder Shares") to the Sponsor for the nominal sum of $25,000 (or approximately $0.004 per share), which became 6,037,500 Founder Shares following a dividend and an IPO-related forfeiture.

5.      Concurrently with the IPO, the Sponsor purchased 501,081 private placement units (the "Private Placement Unit(s)") for $6.18 million (or $10.00 per unit). Each Private Placement Unit consisted of one share of Class A common stock (the "Private Placement Share(s)") and one-half of one warrant. Each whole warrant (the "Private Placement Warrant(s)") was exercisable in exchange for one share of common stock for $11.50. The Private Placement Warrants were not exercisable, saleable, or tradeable until 30 days after InterPrivate's completion of an initial

4

business combination. With respect to the Founder Shares and Private Placement Shares, the Sponsor waived its redemption rights and they were not entitled to liquidating distributions from the trust if InterPrivate did not consummate a business combination.

6.     The Controller Defendants quickly aligned the interests of the other Defendants with their own. Prior to the IPO, the Sponsor granted 30,000 Founder Shares to InterPrivate's purportedly independent directors, Harris, Luckett, and Cinquegrana. Following the IPO, the Sponsor granted Harris an interest equivalent to 100,000 Founder Shares and 12,500 Private Placement Warrants for an investment of $250,000 in the Sponsor (or $2.50 per share, not including the warrants), and Luckett received 20,000 Founder Shares of common stock and 2,500 Private Placement Warrants in exchange for an investment of $50,000 in the Sponsor (again, $2.50 per share, not including warrants).

7.     InterPrivate's structure created an inherent conflict of interest between the Defendants and the public stockholders. If InterPrivate succeeded in consummating a business combination, Defendants would hold shares and warrants in the combined company. But if InterPrivate liquidated, Defendants' shares and warrants would be worthless, and the Defendants would lose their entire investments. Thus, the interests of Defendants in getting any deal done to avoid liquidation provided them with a perverse incentive to complete a merger regardless

5

of whether it was in the best interests of the Company's public stockholders. Furthermore, since Defendants would continue to hold their shares and warrants after any business combination, they had an interest in discouraging public stockholders from redeeming their shares, as each share redeemed would dilute their interests in the post-transaction company and reduce the liquidity provided to the post-transaction company.

8.      It was no surprise, then, that the Board approved the Merger and disseminated a false and misleading proxy statement (the "Proxy"). The Proxy withheld critical information from InterPrivate's public stockholders concerning the high degree of dilution of InterPrivate shares and dissipation of cash that would occur in connection with the Merger. Whereas InterPrivate Shares were valued at $10.00 for purposes of the share exchange provided for in the Merger Agreement, those shares were worth far less. The dilution and dissipation of cash reduced the value of shares that InterPrivate would contribute to the Merger to less than $8.50 per share, which in turn reduced the value that InterPrivate stockholders could reasonably expect InterPrivate to contribute to the Merger, and therefore the value of the post-Merger shares that InterPrivate stockholders could expect to hold if they chose to invest in the Merger.

9.      Because of this undisclosed mismatch, in order to exchange equivalent value with InterPrivate in the Merger, Legacy Aeva would have to inflate its value

*at least* commensurately with the inflation of InterPrivate's share value. This is indeed what it did.

10.    The Proxy contained materially false and misleading representations and omitted material information about Legacy Aeva's value and expected future financial performance, including the financial projections disclosed in the Proxy (the "Proxy Projections") that supported the inflated value of Legacy Aeva. The Proxy failed to disclose: ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

11.     At the March 11, 2021 stockholder meeting, the Merger was approved, and, on March 12, 2021, it subsequently closed.

12.     After the Merger closed, New Aeva immediately began missing the Proxy Projections, and the margin of that miss increased with every passing quarter. While the Proxy Projections told public stockholders that Legacy Aeva projected over $11 million in revenue for 2021 (the year of the Merger), New Aeva missed by over 15%, only achieving $9.265 million in total revenues. Fiscal years 2022 and 2023 were even farther off the mark, with revenues of $4.2 and $4.3 million, respectively, compared with the $35 million and $75 million, respectively projected in the Proxy Projections.

13.     Gross profits have likewise substantially missed the mark, decreasing dramatically over the post-Merger time period, with $3.4 million in 2021 compared with the $5 million projected in the Proxy, and gross *losses* of $4.2 million in 2022, and $5.9 million in 2023, compared with the $19 million and $43 million, respectively, in annual gross *profits* projected in the Proxy Projections.

14.     The deeply conflicted Director Defendants, Officer Defendants, and Controller Defendants breached their duties of loyalty and candor by recommending the Merger to stockholders and impairing their redemption rights by providing false

8

and misleading information in the Proxy and omitting from the Proxy information that was material to public stockholders' decision whether to redeem their shares or invest in the Merger. Defendants did this to promote their own self-interest in seeing the redemptions minimized and the Merger consummated.

15.    Although an abysmal deal for InterPrivate's public stockholders, the Merger was a financial windfall for Defendants, who paid less than a penny per Founder Share. On March 21, 2021, the first day New Aeva common stock traded post-Merger, New Aeva's stock closed at $16.16 per share. Based on then-current trading prices, the Founder Shares were worth $97.6 million, a return of over ▮▮▮▮▮▮ on the Sponsors' investment.

16.    Due to the conflicts of interest on the part of Defendants, the Merger requires judicial review for entire fairness, a test which Defendants cannot meet.

## PARTIES

17.    Plaintiff Louis Smith is a New Aeva stockholder who purchased shares of InterPrivate Class A common stock on January 11, 2021 and has held shares since that date.

18.    Defendant InterPrivate Investment LLC was InterPrivate's Sponsor. The Sponsor controlled InterPrivate. InterPrivate Capital LLC ("IPC") was the sole

9

manager of the Sponsor. According to the Proxy,[1] IPC is a wholly owned subsidiary of IP LLC, a private investment firm that was founded by and is controlled by Fattouh. The Sponsor was the beneficial owner of 6,037,500 Founder Shares and 501,081 Private Placement Units.

19.    Defendant Ahmed Fattouh was the Chairman and CEO of InterPrivate. Fattouh controlled the Sponsor. Fattouh is a serial SPAC founder and controller. Fattouh is also the CEO, founder, and controller of IP LLC, which also controlled the Sponsor. Fattouh, was the chairman, co-controller, and CEO of the SPAC InterPrivate II Acquisition Corp. ("IP II"), which merged with private company GetAround, Inc. ("GetAround"), on December 8, 2022. Fattouh is also the founder and CEO of InterPrivate Acquisition Partners ("IPAP"), a "multi-strategy SPAC platform." IPAP "is a private investment firm that invests on behalf of a consortium of family offices in partnership with independent private equity and venture capital sponsors." IPAP's current SPAC portfolio includes InterPrivate III Financial Partners Inc. ("IP III"), and InterPrivate IV InfraTech Partners Inc. ("IP IV"). IPAP's "Team" includes Fattouh, Bentley, and Patel. Fattouh is the founder, co-controller, and chairman of IP III and IP IV. Fattouh is also a founding member and the CEO of Landmark Value Investments ("Landmark"), an asset management firm for which

---

[1] Although the Proxy stated that IPC was a wholly owned subsidiary of IP LLC, Plaintiff was unable to identify any proof that IPC ever existed as a corporate entity distinct from IP LLC.

Bentley previously served as an officer. Fattouh was the beneficial owner of 6,037,500 Founder Shares, and 501,081 Private Placement Units.

20.     Defendant Brandon Bentley was a director and the GC of InterPrivate. Bentley is the co-founder, GC, and Chief Operating Officer ("COO") of IP LLC. Bentley was a director and the GC of IP II. Bentley is the COO and GC of IPAP, and the GC of IP III and IP IV. From 2005 to 2014, Bentley was the GC, COO, and Chief Compliance Officer ("CCO") of Landmark.

21.     Defendant Jeffrey Harris was a director of InterPrivate. The Sponsor gifted Harris 30,000 Founder Shares valued at $443,000 as of the record date in the Proxy. Also, at the invitation of the Controller Defendants, Harris also invested $250,000 in the Sponsor entitling him to an interest equivalent to 100,000 Founder Shares and 12,500 Private Placement Warrants held by the Sponsor. Harris was also director of IP II and was gifted 30,000 IP II founder shares and 8,603 IP II "Bonus Shares," valued at $384,486 as of the record date in the IP II de-SPAC merger proxy statement.

22.     Defendant Matthew Luckett was nominated to the Board after InterPrivate's IPO. The Sponsor gifted Luckett with 30,000 Founder Shares valued at $443,000 as of the record date in the Proxy. Also, at the invitation of the Controller Defendants, Luckett invested $50,000 in the equity of the Sponsor entitling him to an interest equivalent to an additional 20,000 Founder Shares and 2,500 Private

11

Placement Warrants held by the Sponsor. Luckett was also director of IP II and was gifted 30,000 IP II founder shares and 8,603 IP II "Bonus Shares," valued at $384,486 as of the record date in the IP II de-SPAC merger proxy statement.

23.    Defendant Pietor Cinquegrana was an InterPrivate director. The Sponsor gifted Cinquegrana 30,000 Founder Shares, valued at $443,000 as of the record date in the Proxy.

24.    Defendant Allen Pinto was an SVP of InterPrivate. Pinto is a partner with IP LLC and an EVP of IP II.

25.    Defendant Brian Pham was an SVP of InterPrivate. Pham is a partner with IP LLC. Pham was an EVP with IP II.

26.    Defendant Minish Patel was a VP of InterPrivate. Patel is a principal of IP LLC of IPAP. Patel is a VP of IP III.

27.    Defendant IP LLC is a private investment firm that was founded by and is controlled by Fattouh and is the ultimate parent of the Sponsor. Bentley is IP LLC's co-founder, COO, and GC. Pinto and Pham are both IP LLC partners, and Patel is a principal.

## RELEVANT NON-PARTIES

28.    New Aeva is a publicly traded company, currently listed on Nasdaq under the ticker "AEVA." New Aeva was formerly known as InterPrivate, a publicly traded Delaware corporation formed as a SPAC by the Controller Defendants.

12

Following the de-SPAC Merger of InterPrivate and Legacy Aeva on March 12, 2021, InterPrivate changed its name to Aeva Technologies, Inc.

29.    Legacy Aeva was a provider of perception solutions for automated driving applications, focused in its 4D LiDAR-on-chip silicon photonics technology. Legacy Aeva was founded in 2016 by former Apple engineers Soroush Salehian and Mina Rezk.

30.    EarlyBird Capital is a boutique investment bank that is focused on SPACs. EarlyBird was the primary underwriter in connection with the IPO. The Controller Defendants caused InterPrivate to issue 250,000 "Representative Shares" to EarlyBird for $25.00, and in connection with the IPO, EarlyBird was permitted to purchase 116,919 Private Placement Units. EarlyBird was paid $8.5 million for its role as the underwriter, all of which was contingent on the close of a business combination. According to the Proxy, EarlyBird was also retained as an advisor in connection with the Merger. EarlyBird has served as the lead underwriter in 87 SPAC IPOs, 80% of which have closed de-SPAC mergers, including serving as the underwriter for IP II in its IPO. In connection with its role as an underwriter in the IP II IPO, EarlyBird was allocated 57,538 "Bonus Shares," 200,000 "Representative Shares," and 766,677 private placement warrants, and was paid approximately $4.5 million in underwriting fees dependent on consummation of a business combination.

13

## SUBSTANTIVE ALLEGATIONS

### A.   THE CONTROLLER DEFENDANTS FORMED INTERPRIVATE

31.    On August 16, 2019, the Controller Defendants incorporated InterPrivate in Delaware as a SPAC for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. The Form 424(b)(4) Prospectus (the "Prospectus') issued in connection with the IPO acknowledged and informed stockholders that InterPrivate's initial stockholders, the Sponsor and Fattouh, would "continue to exert control [of InterPrivate] at least until the consummation of a business combination."

32.    In August 2019, the Controller Defendants caused InterPrivate to sell to the Sponsor an aggregate of 5,750,000 Founder Shares in exchange for $25,000, or approximately $0.004 per share. Following a dividend and a forfeiture of certain Founder Shares in connection with the IPO, the Sponsor and Fattouh held 6,037,500 Founder Shares at the time of the Merger.

33.    The Controller Defendants also caused InterPrivate to issue 250,000 representative shares to purported advisor EarlyBird[2] for $25.00 (or $0.0001 per

---

[2] There is no evidence that EarlyBird ever provided *any* advice to Defendants, including in any documents produced in response to Plaintiff's 220 Demand.

14

share) (the "Representative Shares"). Redemption and liquidations rights were waived as to the Representative Shares.

34.     Prior to the IPO, in January 2020, the Sponsor and Fattouh selected and placed Bentley, Harris, and Cinquegrana on the Board and selected and appointed each other InterPrivate officer (Pinto, Bentley, Pham, and Patel).  Shortly thereafter, the Sponsor allocated 30,000 Founder Shares to Cinquegrana and Harris.  The Controller Defendants also granted each of InterPrivate's officers an interest in the Sponsor, but the size of those interests and any consideration paid therefore were not disclosed in the Proxy.

35.     On February 3, 2020, InterPrivate went public through its IPO, in which it sold 21,000,000 units to public investors at $10.00 per public unit ("Public Unit(s)"). Each Public Unit consisted of one share of Class A common stock ("Public Share(s)") and one-half of one whole warrant. Each whole warrant ("Public Warrant(s)") was exercisable in exchange for one share of Class A common stock at an exercise price of $11.50. Each Public Share came with a redemption right that allowed those Public Shares to be redeemed at $10.00 per share plus any accrued interest from the trust held in public stockholders' benefit in the event of a request to extend InterPrivate's liquidation deadline or a vote on a business combination. Even if public stockholders redeemed their Public Shares, they would be permitted to retain their Public Warrants. In the event of a liquidation, public stockholders were

15

entitled to receive the same $10.00 per share plus interest in liquidating distributions from the trust.

36. On February 10, 2020, InterPrivate consummated the sale of an additional 3.15 million Public Units subject to the underwriters' exercise of their over-allotment option at $10.00 per Public Unit, generating additional proceeds of $31.5 million, resulting in a total of $241,500,000 in cash placed in the trust.

37. Following the IPO, the Founder Shares and Representative Shares held by the Sponsor, the Director Defendants, and EarlyBird comprised in excess of 22% of the outstanding equity of InterPrivate.

38. Simultaneously with the consummation of InterPrivate's IPO, the Sponsor and EarlyBird purchased 618,000 Private Placement Units at a price of $10.00 per unit, generating proceeds of approximately $6.18 million. Each Private Placement Unit included one Private Placement Share and one-half of one Private Placement Warrant.

39. InterPrivate had until November 6, 2021, to close a business combination. In the alternative, InterPrivate could seek stockholder approval for an extension of the time period in which it could consummate a transaction, but in such circumstances, would have to give public stockholders the option to redeem their shares at $10.00 per share plus interest.

16

**B.** **THE CONTROLLER DEFENDANTS LARD THE BOARD WITH LOYALISTS AND ENSURED THAT THEIR FINANCIAL INTERESTS WERE ALIGNED**

40.    Fattouh and IP LLC controlled the Sponsor and with Bentley, they exercised control over InterPrivate.

41.    Fattouh placed himself on the Board as Chairman and named himself Interprivate's CEO, and stacked InterPrivate with executives and directors with heavily conflicted ties to the Sponsor, Fattouh, IPC, IP LLC, and other entities connected with the SPAC and Merger process.

42.    The Controller Defendants appointed Bentley as InterPrivate's GC and placed him on the Board. Bentley is the co-Founder and COO of IP LLC, was a director and the GC of IP II. Bentley is the COO and GC of IPAP, and the GC of IP III and IP IV. From 2005 to 2014, Bentley was the GC, COO and CCO of Landmark.

43.    The Controller Defendants appointed Harris to the Board. Harris was gifted 30,000 Founder Shares by the Sponsor and was provided with the opportunity to invest $250,000 in the equity of the Sponsor for a total of 100,000 shares of common stock and 12,500 warrants. As of January 29, 2021, the record date in the Proxy, Harris's Founder Shares were worth $443,000, his common stock was worth approximately $1.5 million, and his warrants were worth approximately $46,000. The total value of Harris' assets was nearly $2 million, an ▓▓▓▓ return on his investment factoring in the Founder Shares, and a ▓▓▓▓ return on his actual

17

monetary investment. Harris was also director of IP II and was gifted 30,000 IP II founder shares and 8,603 IP II "Bonus Shares," valued at $384,486 as of the record date in the IP II de-SPAC merger proxy statement.

44.    In April 2020, the Controller Defendants appointed Luckett to the Board. Luckett was gifted 30,000 Founder Shares by the Sponsor and was provided with the opportunity to invest $50,000 in the equity of the Sponsor for a total of 20,000 shares of common stock and 2,500 warrants. As of January 29, 2021, the record date in the Proxy, Luckett's Founder Shares were worth $443,000, his common stock was worth approximately $295,000, and his warrants were worth approximately $9,250. The total value of Luckett's assets was nearly $750,000, a ▓▓▓▓▓ return on his investment factoring in the Founder Shares, and a ▓▓▓▓▓ return on his actual monetary investment. Luckett was also director of IP II and was gifted 30,000 IP II founder shares and 8,603 IP II "Bonus Shares," valued at $384,486 as of the record date in the IP II de-SPAC merger proxy statement.

45.    The Controller Defendants appointed Cinquegrana to the Board. Cinquegrana was gifted 30,000 Founder Shares, valued at $443,000 as of the record date in the Proxy.

46.    The Controller Defendants appointed Pinto as an SVP of InterPrivate. Pinto is a partner with IP LLC, the entity that directly controlled the Sponsor. Pinto was an EVP with IP II. Pinto was also a representative of Emerson Equity LLC,

18

which was entitled to a $1 million advisory fee contingent on the Merger closing, of which Pinto was personally entitled to $900,000.

47. The Controller Defendants appointed Pham as an SVP of InterPrivate. Pham is a partner with IP LLC, the entity that directly controlled the Sponsor, and an EVP with IP II.

48. The Controller Defendants appointed Patel as a VP of InterPrivate. Patel is a principal of IP LLC, the entity that directly controlled the Sponsor, and a principal of IPAP. Patel is also a VP of IP III.

## I.   THE FLAWED MERGER PROCESS

49. Shortly after InterPrivate's IPO, the Board began looking at potential targets. The Controller Defendants identified dozens of potential targets, but Legacy Aeva was not on its list.

50. Initially, InterPrivate was homed in on ███████████████████. Those talks fell apart when ███████████ agreed to a deal with another SPAC—████████████████████████████████. Like Legacy Aeva, the ████████████ de-SPAC would also end up in disaster. Today, ████████████ stock trades at less than ████ per share.

51. With ████████████ off of the table, sometime in September 2020, the Company commenced discussions with Legacy Aeva about a potential business combination. A partner at Lux Capital Management ("Lux Capital"), a Legacy Aeva

19

investor, which, at the time, also held a seat on the Legacy Aeva board of directors, introduced Fattouh to Salehian, Legacy Aeva's President and CEO. Fattouh set up a meeting with Salehian and InterPrivate's management team for an initial discussion of Legacy Aeva's prospects.

52.   The Proxy reports that on September 4, 2020, InterPrivate reached out to Morgan Stanley to advise InterPrivate regarding Legacy Aeva's business and its suitability as a potential acquisition candidate. Morgan Stanley was also retained as a placement agent for PIPE transactions. According to the Proxy, EarlyBird was a financial advisor to the Board, but there is no evidence that EarlyBird provided any actual financial or other Merger-related advice to the Board.

53.   On September 9, 2020, Legacy Aeva made a presentation to InterPrivate's management team and Morgan Stanley, which included a general discussion of Legacy Aeva's financial prospects.

54.   ████████████████████████████████, and on September 13, 2020, Legacy Aeva provided the Company with access to a data room and its full financial model. Legacy Aeva also provided InterPrivate management with a presentation that set forth ██████████████████████████ ████████ (the "Legacy Aeva Presentation"). The Legacy Aeva Presentation contained ████████████████████████████████ statements and data in the Proxy.

20

55.     The Legacy Aeva Presentation focused on





56.      the Proxy

Projections, which estimated that 2025 revenue would reach $880 million.

57.     The Legacy Aeva Presentation also included [redacted]

[redacted] than the Proxy Projections as to [redacted]

[redacted]:[4]

---

[3] AEVA_000001300 at 1306.

[4] AEVA_000001300 at 1331-1332.



58.    The Legacy Aeva Presentation provided ███████████████████ ██████████████████ that would be subject to substantial due diligence by InterPrivate. These "█████████" which focused only on "████████████



referenced in the Proxy and related documents:[5]

59.     On September 15, 2020, InterPrivate management had an internal meeting to discuss Legacy Aeva's business prospects and potential estimates of enterprise value for the Merger. That same day, Bentley provided the Board with a copy of the Legacy Aeva Presentation.

60.     On September 17, 2020, Luckett met with InterPrivate management, Fattouh, Pham, and Pinto to discuss Legacy Aeva's business and a potential LOI. That same day, Fattouh sent a draft LOI to Legacy Aeva.

61.     The described sequence in the Proxy of Fattouh's submission of a draft LOI to Legacy Aeva is purposefully misleading. The Proxy suggests that the Board

---

[5] AEVA_000001300 at 1328.

had been apprised of the terms in the initial LOI before it was sent out. But there is no evidence in the Proxy that InterPrivate management's meeting with Luckett occurred before the draft LOI. And the Proxy suggests that the initial LOI was sent out "following" a meeting that had occurred between Legacy Aeva and the Board, and subsequent to follow-up discussions between Fattouh, Harris and Cinquegrana. But the Proxy states that the meeting between Legacy Aeva and the Board, and the follow-up discussions, actually on occurred on September 18, 2020, the day after Fattouh sent the initial LOI. And the Proxy concedes that, when the Board officially met on September 18, 2020, "the draft letter of intent . . . had been submitted."

62.    On September 20, 2020, Legacy Aeva submitted a revised LOI to InterPrivate, ██████████████████████████ ████████████ On September 21, 2020, InterPrivate's legal counsel Greenberg Traurig, LLP ("Greenberg"), submitted a revised LOI to Legacy Aeva. The parties executed this revised LOI that same day. There is no evidence that the Board was involved in these exchanges, reviewed either draft LOI, or approved execution of the final LOI.

63.    The LOIs contemplated that InterPrivate would make a private investment in public equity ("PIPE") offering in connection with the Merger. On September 22, 2020, InterPrivate, Legacy Aeva, Morgan Stanley, and Credit Suisse Securities (USA) LLC ("Credit Suisse") commenced the PIPE placement process,

which would ultimately result in PIPE financing of $320 million at the close of the Merger.

64.     On September 25, 2020, the Board met to discuss the Merger, and was provided with the executed LOI—apparently the first time it was provided with the terms of the proposed Merger.

65.     On October 27, 2020, five days prior to the Board's ultimate approval of the Merger, the Board purportedly met to discuss the Merger and numerous issues related to Legacy Aeva's business and financial prospects. Documents produced in response to Plaintiff's 220 Demand reveal that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████

66.     At some point between the October 27, 2021 board meeting and the November 1, 2021 Merger approval, Defendants' advisors and Legacy Aeva management provided the Board with multiple presentations that set forth material information not disclosed in the Proxy, including: ████████████████

████████  ████  ██████  ██████  ██████  ██  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████   The Board was also provided with a draft of the Investor

25

Presentation that was eventually provided to stockholders and incorporated into the Proxy.

67. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████[6]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[6] AEVA_00001097 at 1098 and 1104.

████████████████████████████████████████████████████

68.    ███████████████████████████████████████████

████████████████████████████████████████████████████

███  ████████  █████  ███  █████  █  █████  █  █████  ██

████████████████████████████████████████████████████

████████████████████████████████

69.    Specifically, with respect to Legacy Aeva's ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

70.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[7]

71.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████.[8]

72.    ████████████████████████████████████████

████████████████████████████████████████████

[7] AEVA_000000580 at 603; 000000580 at 581.

[8] AEVA_000001342 at 1360.



73.



74. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

75. ███████████████████████████████████████████████████████

██████████████████████████████████████████

76. The Board next met on October 29, 2020 to discuss the Merger and the PIPE. At this meeting, Morgan Stanley purportedly provided a presentation to the Board with ██████████████████████[9]

_____

[9] AEVA_000001478.

77.    On November 1, 2020, the Board met telephonically to approve the Merger. While the Proxy states that representatives of Morgan Stanley attended this meeting to discuss the Merger with Legacy Aeva, production in response to the 220 Demand reveal that representation was false. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████[10] ████████

████████████████████████████████████████. The Board never asked for, or received, a fairness opinion.

78.    InterPrivate and Aeva entered into the Merger Agreement on November 2, 2020 and announced the Merger that same day.

79.    On February 16, 2021, InterPrivate issued the Proxy and disseminated it to InterPrivate's public stockholders. The Proxy set the stockholder vote on the Merger for March 11, 2021 and informed stockholders of their redemption rights. InterPrivate's public stockholders had the option to redeem their shares prior to the close of the Merger and receive their pro rata share of the funds held in trust— approximately $10.07 per share as of September 30, 2020. Stockholders could have redeemed their shares regardless of how they voted on the Merger. And, even if they redeemed their shares, Stockholders would retain their warrants. The deadline to redeem any shares of InterPrivate public stock was March 9, 2021.

---

[10] AEVA_000000771.

80. On March 11, 2021, Defendants secured a sufficient number of votes for the Merger to be consummated, and on March 12, 2021, the Merger closed.

81. The Sponsor, InterPrivate's management, and the rest of the Board, all of whom held an interest in Founder Shares, Private Placement Units, and/or additional investments in the Sponsor, had every incentive to convince stockholders to decide not to redeem their shares, among other reasons, because with every redemption, the cash underlying each InterPrivate share being used as consideration in connection with the Merger would decrease.

82. On March 21, 2021, the first post-close trading day for New Aeva common stock, New Aeva's stock closed at $16.16 per share. As of this date, based on the closing price of New Aeva common stock, the Founder Shares were worth $97.6 million, representing a return of over ███████ on the Sponsors' investment therein. Based on the same metric, the Representative Shares were worth $4.04 million, representing a return of ████████ on Early Bird's investment.

## II.   THE FALSE AND MISLEADING PROXY

83. The Defendants published a false and misleading Proxy that omitted material information that was reasonably available to Defendants. The Board had an affirmative duty to provide materially accurate and complete information to public stockholders in connection with the redemption decision and Merger vote. It failed to do so.

A. **THE PROXY OMITTED MATERIAL INFORMATION AS TO THE VALUE OF INTERPRIVATE SHARES EXCHANGED IN THE MERGER**

84. The Proxy explicitly, and repeatedly, represented to InterPrivate stockholders that the InterPrivate shares to be paid to Legacy Aeva stockholders were deemed to be valued at $10.00 per share. However, the value of New Aeva shares that Legacy View equity holders would receive in the Merger was not $10.00 per share. It was less than $8.50 per share.

85. As with all SPACs, InterPrivate's sole asset prior to the Merger was cash. To calculate the value of a share that InterPrivate would exchange with Legacy Aeva stockholders in the Merger, one begins with cash, subtracts costs, and divides that number by InterPrivate's pre-Merger shares outstanding:

$$\text{Net Cash per Share} = \frac{\text{Cash} - \text{Costs}}{\text{Pre-Merger Shares}}$$

86. At the time of the Proxy, InterPrivate's cash consisted of funds in the trust, net cash outside of the trust, and proceeds of the PIPE.

87. To determine net cash, costs must be subtracted from the total cash held by the Company pre-Merger. As to InterPrivate, those costs include: (1) Merger-related transaction costs; and (2) the value of the Public and Private Placement Warrants.

33

88.    To determine net cash per share, one must divide net cash by the number of pre-Merger shares outstanding, which include: (1) Public Shares; (2) Founder Shares; (3) Private Shares to underwriter; (3) Representative Shares; and (4) PIPE shares.

89.    To the extent one can obtain the inputs listed above—and one cannot obtain all the inputs from the disclosures in the Proxy—InterPrivate's net cash per share at the time the Proxy was filed was less than $8.50 per share, before taking into account any redemptions in connection with the Merger. This is the maximum value InterPrivate would contribute to the Merger—not $10.00. Hence, InterPrivate public stockholders who invested in the Merger instead of redeeming could not reasonably expect to receive $10.00 worth of New Aeva stock in exchange upon consummation of the Merger. At most, all they could expect to receive was the amount they would contribute to the Merger—less than $8.50 per share.

90.    This basic fact was not disclosed to InterPrivate's public stockholders. Furthermore, public stockholders were not informed of the facts they would need to compute this on their own, nor were they even told that such an analysis would be highly relevant to an estimate of the value they could expect to receive if they chose to invest in the Merger rather than redeem their shares. Some of the information used to reach the less than $8.50 figure was scattered across the Proxy in no coherent form and other pieces of information are wholly absent. The Proxy touted the Merger as

34

in the best interests of the Company's stockholders, despite the fact that the stockholders' actual choice was between investing in the Merger, which could reasonably be expected to yield no more than $8.50 per share, or receiving approximately $10.07 per share in a redemption.

91.     Because the Proxy omitted and obfuscated material information needed to determine the net cash underlying InterPrivate shares—and thus the value of those shares—InterPrivate's public stockholders could not make an informed decision whether to redeem their shares or invest in the Merger.

92.     In response to InterPrivate overvaluing its shares at $10.00 in the share exchange provided for in the Merger, it would be reasonable to expect Legacy Aeva to overvalue *its* shares in order to get a fair deal. And indeed, this is what Legacy Aeva did, with the assistance of InterPrivate management, and what the InterPrivate Board accepted. The Proxy did not disclose this risk to public stockholders.

**B.      THE PROXY PAINTED A FALSE AND MISLEADING PICTURE OF LEGACY AEVA'S PROJECTED FUTURE PERFORMANCE AND OMITTED MATERIAL INFORMATION REGARDING THE SAME IDENTIFIED BY INTERPRIVATE'S ADVISORS**

93.     In addition to misrepresenting the value of InterPrivate public stockholders' investments in the Merger to be $10.00 per share, the Proxy materially misrepresented the value of Legacy Aeva and omitted crucial information Defendants discovered in due diligence that raised considerable doubt regarding the Company's financial prospects following the Merger.

35

94.   As set forth herein, Defendants received ████████████████

████████████████████████████████████████████████████████████

███████████   ████████████████████████████████ as set forth in the Proxy

Projections.

95.   Defendants knew or should have known, based on the inflated value

they assigned to InterPrivate shares being used as consideration in connection with

the Merger,████████████████████████████████████

████████████████████████████ that the Proxy Projections were unrealistic

and unachievable, that Legacy Aeva was ████████████████████████

████████████████████████████, and that Legacy Aeva's ████

████████████████████████████ than the Proxy Projections

assumed.

96.   ████████████████████████████████████ provided to the

Defendants in connection with their consideration of the Merger reflected

████████████████████████████████████████████████████████████

than was projected in the Proxy Projections. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

the those set forth in the Proxy Projections. ████████████████████

████████████

97.   Instead, Defendants disclosed the Proxy Projections:

| | Forecast Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| *(USD in millions)* | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
| Revenue | $ 5 | $ 11 | $ 35 | $ 75 | $ 286 | $ 880 |
| Adjusted Gross Profit[1] | $ 3 | $ 5 | $ 19 | $ 43 | $ 177 | $ 552 |
| Adjusted EBITDA[2] | $ (27) | $ (65) | $ (82) | $ (88) | $ 21 | $ 347 |
| Free Cash Flow[3] | $ (28) | $ (69) | $ (91) | $ (100) | $ 15 | $ 343 |

_____

(1)   Adjusted Gross Profit is calculated as Revenue less Cost of Revenue. For purposes of these projections, Cost of Revenue excludes stock-based compensation and manufacturing overhead expenses.
(2)   Adjusted EBITDA is defined as Operating Income (loss) plus depreciation and amortization and stock based compensation.
(3)   Free Cash Flow is defined as Adjusted EBITDA less capital expenditures.

98.   The Proxy Projections included several assumptions that Defendants knew or should have known called into serious question the credibility and reliability thereof, including as to Legacy Aeva customer commitments and ability to capture market share.

99.   In the Investor Presentation (incorporated by reference in the Proxy) Defendants included numerous references to supposed customer commitments that they would later say in the Proxy supported the overly rosy picture painted by the Proxy Projections. The Investor Presentation stated that Legacy Aeva was partnering with "Top Automotive Industry Players" that included Porsche SE, Volkswagen, and ZF. The Investor Presentation also set forth a specific "Current Customer Pipeline" that included "Top 7 partners" and "4 strategic partners" that collectively represented "+80% of 2025E" Automotive Revenue, and a timeline that suggested its Tier 1 partners would start production by 2024.



100.  The Investor Presentation also explained how Legacy Aeva's disclosed customer commitments were built into the Proxy Projections, noting that its "Top 7 partners represent +80% of 2025E Automotive Revenue," which "[i]ncludes +$550MM from Aeva's Top 7 Current Partners":



38

101.  The Proxy independently confirmed that the Proxy Projections relied on revenue from these "customer commitments," including "the development and commercialization of [Legacy] Aeva's product and services" to be utilized by "customers and suppliers in the automotive . . . industries."

102.  Defendants knew or should have known that these statements were materially false and misleading. ████ ████████ ████ ██████████ ████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

103.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.[11]

104.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[11] AEVA_000000580 at 603; 000000580 at 581.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ but Defendants

did not disclose this information.

105.    ██████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

106.    ██████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████.[12] That is, the Board knew or should

have known that ███████████████████████████████████████

███████████████████████████████████████████████████████

████████—a particularly unbelievable assumption given Legacy Aeva's

████████████████████████████████████:

---

[12] AEVA_000001342 at 1360.



107.



108.

109.  That is, the Board knew that

110. Defendants' inclusion of only the Proxy Projections in the Proxy was particularly misleading, in light of the fact that Defendants knew from due diligence that assumptions underlying the Proxy Projections were entirely unrealistic and not capable of achievement.

### C.    INVOLVEMENT OF ADVISORS IN THE MERGER PROCESS

111. The Proxy also painted a false and misleading picture as to the role and existence of InterPrivate's advisors in connection with the Merger.

112. First, the Proxy did not disclose that Defendants retained ███████ ███████ to provide advise to the Board in connection with the Merger or the compensation that ███████████ would receive in connection therewith. This omission is particularly material, as the information that these advisors ██████ ████████████████████ set forth in the Proxy with regard to Legacy Aeva's future financial performance. If Defendants disclosed their participation, they likewise would have had to disclose their ████████████████████ ████████████████████

113. Instead, the Proxy only discloses the purported role of Morgan Stanley in connection with the Board's deliberations, stating that Morgan Stanley attended the November 1, 2020 board meeting at which the InterPrivate Board approved the Merger, seemingly to give a glean of legitimacy or fairness to the Merger process. This representation is directly contradicted by the Company's production in response

43

████ Plaintiff's 220 demand. ██████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████[13]

## III. POST-MERGER REALITY SETS IN

114. Legacy Aeva's performance following the Merger highlights the materiality of Defendants' false and misleading disclosures and material omissions.

115. Ultimately, and predictably, New Aeva has failed to achieve ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

| | | | Proxy Projections | Actual Financial Results |
|---|---|---|---|---|
| **Revenue:** | | | | |
| **2022** | ████ | ██ | $35.3 | $4.2 |
| **2023** | ██ | ██ | $74.9 | $2.7 |
| **2024** | ████ | ██ | $286.3 | |
| **2025** | ████ | ██ | $880 | |
| **Gross Profit:** | | | | |
| **2022** | ████ | ██ | $18.8 | ($4.255) |
| **2023** | ████ | ██ | $42.6 | ($5) |
| **2024** | ████ | ██ | $176.8 | |
| **2025** | ██ | ██ | $551.8 | |

---

[13] AEVA_000000771.

As demonstrated, New Aeva has never come close to meeting any of the projections set forth in the Proxy Projections, and its references to previously disclosed "customer commitments" have largely disappeared post-Merger.

116. On September 22, 2023, New Aeva announced that it had received a notice of delisting from the New York Stock Exchange because its average closing price was trading below $1.00 per share for the previous 30 consecutive days. New Aeva stock had last traded above $1.00 per share on September 6, 2023.

117. Most recently, on March 5, 2024, New Aeva reported full year 2023 revenue of $4.3 million as compared to $75 million set forth in the Proxy Projections, and gross loss of $5.9 million, as compared to projected gross profit set forth in the Proxy Projections of $43 million.

118. As of March 5, 2024, New Aeva traded at $1.01 per share, representing a 90% loss for public stockholders who could have redeemed in lieu of investing the Merger, but *at least* a ▮▮▮▮▮ return on the Defendants' Founder Shares.

## CLASS ACTION ALLEGATIONS

119. Plaintiff, a stockholder in the Company, brings this action individually and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of himself and all record and beneficial holders of InterPrivate common stock, who held such stock as of the redemption deadline and who elected not to redeem all or some of their stock (except the Defendants herein,

and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants) and their successors in interests.

120. This action is properly maintainable as a class action.

121. A class action is superior to other available methods of fair and efficient adjudication of this controversy.

122. The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands, and they are likely scattered across the United States. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

123. There are questions of law and fact which are common to all Class members and which predominate over any questions affecting only individuals, including, without limitation:

    a.    whether Defendants owed fiduciary duties to Plaintiff and the Class;

    b.    whether the Controller Defendants controlled the Company;

    c.    whether "entire fairness" is the applicable standard of review;

    d.    which party or parties bear the burden of proof;

    e.    whether the Defendants breached their fiduciary duties to Plaintiff and the Class;

    f.    the existence and extent of any injury to the Class or Plaintiffs caused by any breach; and

46

g.      the proper measure of the Class's damages.

124.   Plaintiff's claims and defenses are typical of the claims and defenses of other Class members, and Plaintiff has no interests antagonistic or adverse to the interests of other Class members. Plaintiff will fairly and adequately protect the interests of the Class.

125.   Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

126.   Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

127.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## COUNT I
**(Direct Claim for Breach of Fiduciary Duty
Against the Director Defendants)**

128.   Plaintiff repeats and realleges each and every allegation herein as if set forth in full in this Count.

47

129. As directors of the Company, the Director Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate material disclosures to the Company's stockholders.

130. These duties required them to place the interests of the Company stockholders above their personal interests and the interests of the Controller Defendants.

131. Through the events and actions described herein, the Director Defendants breached their fiduciary duties of loyalty and candor to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests in a manner unfair to and misleading Plaintiff and the Class by failing to adequately inform public stockholders of material information necessary to allow them to make an informed redemption decision.

132. As a result, Plaintiff and Class members were harmed due to the impairment of their redemption rights prior to the Merger.

133. Plaintiff and Class members suffered damages in an amount to be determined at trial.

## COUNT II
### (Direct Claim for Breach of Fiduciary Duty
### Against the Officer Defendants)

134. Plaintiff repeats and realleges each and every allegation herein as if set forth in full in this Count.

135. As the most senior officers of the Company, the Officer Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide accurate material disclosures to the Company's stockholders.

136. These duties required the Officer Defendants to place the interests of the Company's stockholders above their personal interests and the interests of the Controller Defendants. The Officer Directors are not exculpated for breaches of their duty of care for actions taken in their capacity as officers (which include all actions set forth herein except their formal vote to approve the Merger).

137. Through the events and actions described herein, the Officer Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to the Company's public stockholders. The Officer Defendants also breached their duty of candor by issuing the false and misleading Proxy, as well as making other false and misleading statements with regard to the Merger.

49

138.    As a result, Plaintiff and the Class were harmed due to the impairment of their redemption rights prior to the Merger.

139.    Plaintiff and Class members suffered damages in an amount to be determined at trial.

### COUNT III
### (Direct Claim for Breach of Fiduciary Duty
### Against the Controller Defendants)

140.    Plaintiff repeat and realleges each and every allegation herein as if set forth in full in this Count.

141.    The Controller Defendants were the Sponsor, IP LLC, Fattouh, and Bentley. The Controller Defendants elected the members of the Board with deep personal and financial ties to the members of the Board they selected and further incentivized them and aligned their interests with those of the Controller Defendants by granting them Founder Shares and interests in the Sponsor.

142.    As such, the Controller Defendants owed Plaintiff and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, and to provide accurate material disclosures to InterPrivate stockholders.

143.    At all relevant times, the Controller Defendants had the power to control, influence, and cause—and actually did control, influence, and cause—InterPrivate to enter into the Merger.

50

144. Through the events and actions described herein, the Controller Defendants breached their fiduciary duties of loyalty and candor to Plaintiffs and Class members by failing to adequately inform public stockholders of material information necessary to allow them to make an informed redemption decision.

145. As a result, Plaintiff and Class members were harmed due to the impairment of their redemption rights prior to the Merger.

146. Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT V
### (Direct Claim for Unjust Enrichment
### Against All Defendants)

147. Plaintiff repeats and realleges each and every allegation and Count set forth above as if set forth in full herein.

148. As a result of the conduct described herein, the InterPrivate Defendants breached their fiduciary duties to InterPrivate public stockholders and were disloyal by putting their own financial interests above those of InterPrivate public stockholders.

149. IP LLC and EarlyBird aided and abetted the InterPrivate Defendants' breaches of fiduciary duties to InterPrivate public stockholders, putting their own financial interests first.

150. Defendants were unjustly enriched.

51

151. All unjust profits realized by Defendants should be disgorged and recouped by the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and relief in their favor and in favor of the Class, and against Defendants, as follows:

A.    Declaring that this Action is properly maintainable as a class action;

B.    Finding the InterPrivate Defendants liable for breaching their fiduciary duties owed to Plaintiff and the Class;

C.    Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as the controllers of InterPrivate, owed to Plaintiff and the Class;

D.    Finding that Defendants were unjustly enriched;

E.    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

F.    Awarding rescission or rescissory damages to Plaintiff and the Class;

G.    Ordering disgorgement of any unjust enrichment to the Class;

H.    Certifying the proposed Class;

I.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

J.      Awarding Plaintiff and the Class such other relief as this Court deems

just and equitable.

Dated: March 7, 2024

**OF COUNSEL:**

**GRANT & EISENHOFER P.A.**
David Wissbroecker (*pro hac vice* application to be filed)
2325 3rd Street, Suite 329
San Francisco, CA  94107
(415) 229-9720

**BRONSTEIN, GEWIRTZ &**
  **GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, 46th Floor
New York, NY  10165
(212) 697-6484

*Counsel for Plaintiff*

**GRANT & EISENHOFER P.A.**

*/s/ Kelly L. Tucker*
Michael J. Barry (#4368)
Kelly L. Tucker (#6382)
123 S. Justison Street, 7th Floor
Wilmington, DE  19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Counsel for Plaintiff*